THE KOPPERS COAL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 108492. Promulgated May 29, 1946.

*John E. McClure, Esq., Edward Updike, Esq.,* and *Donald P. Moyers, Esq.,* for the petitioner.

*J. Harrison Miller, Esq.,* for the respondent.

LEECH, *Judge*: Respondent has determined deficiencies in income tax for the calendar years 1936 and 1937 of $60,696.83 and $147,588.44, respectively, and a deficiency in unjust enrichment tax for the calendar year 1936 in the sum of $24,403.39. Seventeen issues are framed by the pleadings. Certain of these are disposed of by stipulation, effect to which will be given in the settlement under Rule 50. Each issue will be set out separately hereinafter together with the facts pertaining thereto and the opinion thereon. Certain of the facts were stipulated and these we include by reference in our findings of fact under the several issues. Such facts set out under the several issues as are not stipulated we find from the evidence introduced at the hearing.

*Issue 1.*

The question for decision is whether, for the purpose of computing petitioner's allowable deductions for depletion and depreciation for 1936 and 1937, its basis for six West Virginia coal mining properties is $7,600,000, plus the cost of additions, or is the aggregate basis of the properties to the six predecessor corporate owners in the sum of $3,525,634.13, plus cost of additions.

### FINDINGS OF FACT.

Massachusetts Gas Companies, a predecessor in interest of the petitioner, was established in the State of Massachusetts September 25, 1902, by an agreement and declaration of trust, for the purpose of acquiring all of the stocks of the New England Gas & Coke Co., the Brookline Gas Light Co., the Dorchester Gas Light Co., the Jamaica Plain Gas Light Co., and the Massachusetts Pipe Line Co., the latter serving as the connecting link between the New England Gas & Coke Co. and the other controlled gas companies which it then owned, or might supply with gas in the future. At that time, New England Gas & Coke Co. owned a byproduct coke oven plant at Everett, Massachusetts, which had been constructed as a central source of gas for the foregoing companies. The plant was located on the Everett Peninsula, easily accessible to both rail and ocean transportation.

By 1925, Massachusetts Gas Companies owned directly all of the stock of the Boston Consolidated Gas Co., a Massachusetts corporation organized in 1903, whose business had been and was that of manufacturing, producing, and selling gas for light, heat, and power, supplying Boston, South Boston, Roxbury, Dorchester, East Boston, Chelsea, Jamaica Plain, Brookline, Newton, Watertown, Waltham, Weston, Wellesley, and Quincy.

By 1925, Massachusetts Gas Companies also owned directly all of the stock of the New England Fuel & Transportation Co., which in turn had acquired and owned the Everett By-Product Coke Plant, East Boston Marine Repair Plant, Charleston Coal Plant, Beverly Coal Plant, Providence Coal Plant, and two large coal mines located in West Virginia. At that time New England Fuel & Transportation Co. also owned all of the stock of the Mystic Steamship Co., which, in turn, owned certain colliers, general cargo steamers, lighters, tugs, and barges for the shipment of coal from Norfolk, Virginia, and elsewhere to the Everett plant in Boston and other points along the eastern seaboard. By 1925 New England Fuel & Transportation Co. also owned all the stock of the New England Coal & Coke Co., which, in turn, was a sales agent for bituminous coal and coke in the New England states. New England Fuel & Transportation Co. also owned

all the stock of Castner, Curran & Bullitt, Inc., which, in turn, was a sales agent for bituminous coal in the Middle Atlantic and Midwestern States. It also owned all the stock of the Mystic Iron Works, a manufacturer and shipper of pig iron.

In 1925 the New England Fuel & Transportation Co. owned and operated the Everett By-Product Coke Plant. That plant consisted of a number of byproduct ovens, and it made gas, which was sold to the Boston Consolidated Gas Co., coke, which was sold for foundry and domestic use, and byproducts, such as tar, ammonia, and benzol, and other commodities which plants of that kind make in their operation. New England Fuel & Transportation Co. also owned discharging towers and storage yards for coal, which were used in its operations, as well as the coal which was discharged for commercial resale through the New England Coal & Coke Co. It also owned a coal plant at Beverly, which consisted of towers, storage bins, and wharf for the rehandling or storing of bituminous coal, which was resold to various users, retail and industrial, in the Beverly area. It also owned coal mines which originally had been acquired from the Federal Coal Co. about 1909. Those mines produced gas coal, a part of which was used by the Everett byproducts plant in their coke plant operations and the balance was sold for other purposes to industrial customers. It also owned a small marine repair plant at East Boston and all of the stock of the Mystic Steamship Co., which owned and operated 12 or 13 collier type steamers for the transportation of coal from Baltimore, Hampton Roads, and Philadelphia to Boston, Beverly, and such users of coal who were customers of the New England Coal & Coke Co. It also owned a number of harbor lighters and tugs and a number of barges, of the seagoing type, for the transporting of bituminous coal from the Hampton Roads, Philadelphia, an Baltimore terminals to the customers of the New England Coal & Coke Co.

In 1925, New England Coal & Coke Co. attended to the securing of the coal used by the Everett byproducts plant, bringing the coal to tidewater, and arranging for the dumping and transportation of such coal in the vessels of the Mystic Steamship Co. and delivering it as was required by the New England Fuel & Transportation Co. In addition, New England Coal & Coke Co. did a very large commercial business in various kinds of coal and in 1925 handled about 4,200,000 tons of bituminous coal, of which about 3,000,000 tons came from the so-called smokeless field in West Virginia. It bought coal from the producers in various fields, taking title to the coal at the point of shipment and delivering it to customers in the tidewater area in New England and the all-rail area in New England.

In 1925, the Boston Consolidated Gas Co. purchased its gas in part from the Everett byproducts plant and augmented its supply with water gas which it manufactured at the plant that it owned at Everett.

The Federal mines, hereinbefore referred to, were located at Fairmont, West Virginia. They are gas coal mines producing a high volatile coal. They were bought primarily to furnish that kind of coal for use at the Everett plant and, in 1925, supplied about 35 to 40 percent of the coal used at that plant. The balance of the coal used by Everett was low volatile, which was produced in West Virginia in the so-called Beckley area.

New England Coal & Coke Co.'s merchant coal business was handicapped because the larger buyers of coal preferred to lodge their contracts with concerns which were fortified by the ownership of the mines producing the coal. New England Coal & Coke Co. could make contracts only from year to year or for even lesser intervals. This handicapped that company because its larger purchasers wished to feel assured that the concern from which they were buying coal was in a position to supply their coal needs for a period of years. In 1925 and prior thereto, New England Coal & Coke Co. had some agency contracts which expired and one producing group set up its own sales agency in Boston and disposed of its coal to the same users who had been customers of New England Coal & Coke Co. when it held the agency. By 1925, it had become evident to the New England Coal & Coke Co. that, as its business grew, the group of companies of which it was a part had to own and operate additional coal mines.

For these and additional reasons, Massachusetts Gas Companies, prior to and during 1925, was seeking to acquire additional coal properties of the Pocahontas and New River type of coal located in West Virginia, which was well known as a good grade of low volatile coal for coking and the manufacture of gas for light, heat, and power purposes. Sound coke oven practice requires that the coal to be coked be a mixture of high and low volatile coal, and at that time Massachusetts Gas Companies, through its subsidiary, New England Fuel & Transportation Co., owned high volatile coal mines, but owned no low volatile coal mines. During this time, Massachusetts Gas Companies sought to acquire certain coal producing properties located in West Virginia and then owned by the following six corporations:

| | |
|---|---|
| East Gulf Coal Co. | Long Branch Coal Co. |
| Prince Wick Coal Co. | Glencoe Coal Co. |
| Pemberton Fuel Co. | E. E. White Coal Co. |

What Massachusetts Gas Companies needed and wished to acquire were the coal producing properties of the six mentioned corporate owners. Five of these companies were represented by P. M. Snyder, who was the president of each. The E. E. White Coal Co. was represented by its president, E. E. White.

Massachusetts Gas Companies was interested in acquiring the coal producing properties of the six listed corporations. The coal sold from these mines did not have trade names as such. It was sold as

Beckley coal and there were other mines producing and selling Beckley coal.

On October 23 and 24, 1925, conferences were held in New York and in Baltimore with P. M. Snyder and E. E. White, at which the representatives of the Massachusetts Gas Companies took the position that, inasmuch as all that company wanted was the physical coal properties, the method to use was for the six companies to sell the physical coal properties to Massachusetts Gas Companies for a fixed price. At these conferences forms were prepared for the purchase by Massachusetts Gas Companies or its nominee of the physical coal properties of the six mentioned companies.

On October 24, 1925, Massachusetts Gas Companies made a written offer to the five Snyder companies to purchase the producing properties owned by them upon the terms and conditions therein set forth. This offer stated:

That the total consideration price shall be payable at the time of transfer and conveyance, and shall be the sum of $3,900,000 all cash, or at your option the consideration price shall be the sum of $4,000,000 in which latter case one-half thereof, or $2,000,000, shall be payable in cash, and the other one-half thereof shall be payable in 6% twenty year bonds of the principal amount of $2,000,000 secured by a first or purchase money mortgage on all the properties to be conveyed by your respective corporations hereunder, or in other securities of the said principal amount acceptable to you.

Also on October 24, 1925, Massachusetts Gas Companies made a written offer to E. E. White Coal Co. for the purchase of that company's coal producing properties, which offer stated:

That the consideration price shall be payable at the time of transfer and conveyance and shall be the sum of $3,400,000 all cash, or at your option the consideration price shall be the sum of $3,500,000 in which latter case one-half thereof or $1,750,000 shall be payable in cash and the other one-half thereof shall be payable in 6% twenty year bonds of the principal amount of $1,750,000 secured by a first or purchase money mortgage on the properties to be conveyed by your Corporation hereunder or in other securities of said principal amount acceptable to you.

The six coal mining companies in question were unwilling to sell their physical properties, their primary reason being that there would be a Federal corporate income tax imposed on each corporation arising out of the sale of its assets at the figure offered and another tax upon its stockholders upon distribution of the proceeds of the sale in liquidation.

On October 31, 1925, Snyder, as representative of five of the West Virginia corporations, wrote the Massachusetts Gas Companies declining its offer of October 24, 1925, and in lieu thereof offered to sell the stocks of the five West Virginia corporations, the stockholders of each, prior to such sale, to receive in distribution from their companies all of the assets of each except the physical properties and

leases and to assume all of the existing indebtedness of each corporation. This letter stated:

I am authorized to offer you their stock on the basis of $200.00 per share for the East Gulf Coal Company, Long Branch Coal Company, Prince-Wick Coal Company and Pemberton Fuel Company, and $100.00 per share for Glencoe Coal Company. This would make a total of $4,200,000.00 for the plants, real estate, merchandise, equipment, supplies, etc., of the above named companies just as they stand, all to be free from debts, we to retain all liquid assets such as cash, accounts and bills receivable, balance due on sub-lease from C. H. Meade Coal Company, etc.

We have from 65 to 85% of the stock of these various companies pledged to accept this proposition, and we fei quite sure we would be able to round up all the stock. However, if we should fail in this, we would then be willing to sell you, subject to the consent of our lessors, the plants, leaseholds, real estate, merchandise, supplies, etc., of the five corporations above mentioned (we to retain the liquid assets such as cash, accounts and bills receivable, balance due on sub-lease to C. H. Meade Coal Company, etc.,) at a total price of $4,200,000.00, plus any tax that may be assessed against our corporations by the United States Government on account of the sale of these properties.

One obstacle to the direct sale by the six West Virginia corporations of their physical properties and leases was that many of their leases, which represented most valuable assets, required the written consent of the lessors to a conveyance. The representatives of the E. E. White Coal Co. made orally the same answer as did the other five companies to the offer made it and for the same reasons, stating a willingness to sell all of the stock, with the understanding that the stockholders would retain all of the corporate assets other than the coal properties and would assume all of the company's liabilities, whether disclosed or not.

Thereafter, early in November 1925, conferences were held between representatives of the several parties and substitute agreements were worked out providing for the acquisition by Massachusetts Gas Companies of all of the stocks of the 6 companies, the stockholders of each to retain all of the corporate assets other than the physical properties and leases, the consideration to be paid in the case of the Snyder companies being $4,100,000 and in the case of the E. E. White Company, the consideration to be $3,500,000.

As a step in carrying out the terms of the agreement, a trust agreement was entered into between the five Snyder companies and P. M. Snyder, as trustee for all of the holders of the outstanding stock of each company, pursuant to which these five companies distributed to Snyder, as trustee, all of the assets except coal reserves and certain other specified properties connected with mining operations, including mining machinery and other equipment and stores engaged in supplying miners. There was also executed a trust agreement between the E. E. White Coal Co. and E. E. White, as trustee for all the owners

of the outstanding stock of that company, pursuant to which the company, on January 1, 1926, distributed to E. E. White, as trustee, all of its assets except coal reserves and certain other specified properties, including mining machinery and stores engaged in supplying miners. Upon this being done, Massachusetts Gas Companies paid the considerations called for in its two agreements of $4,100,000 for the capital stocks of the Snyder companies and $3,500,000 for the capital stock of the E. E. White Coal Co. and received the stocks of those corporations. The shareholders of the six companies assumed all liabilities of those companies.

The Massachusetts Gas Companies immediately upon the acquisition of the stocks of the six aforesaid companies took steps to secure the consent of the various lessors of the leases owned by those companies to the transfer of these leases to another company. In certain cases the parties in interest whose consent had to be secured were minors, requiring proceedings in court, and these obstacles to the immediate conveyance were not finally removed until near the close of the year 1926.

On May 31, 1926, Massachusetts Gas Companies transferred the stocks of the six predecessor corporate owners of the West Virginia mines, which it had acquired for a consideration of $7,600,000, in exchange for 76,000 shares of $100 par value capital stock of New England Fuel & Transportation Co., one of its already existing subsidiaries. In the latter part of December 1926, New England Fuel & Transportation Co. exchanged the stocks of the six predecessor corporate owners of the West Virginia mines for all of the capital stock of the C. C. B. Smokeless Coal Co., a new Massachusetts corporation which had been formed for the purpose of taking over the properties of the six corporations acquired, and on January 1, 1927, the six mentioned companies transferred all of their properties and liabilities to the C. C. B. Smokeless Coal Co. in exchange for their respective capital stocks, and were thereupon dissolved.

From the inception of the desire by Massachusetts Gas Companies to acquire the physical coal properties of the six predecessor corporate owners, it was at all times the plan of that company to acquire such physical coal properties and to place these in one corporation, the stock of which was to be owned by New England Fuel & Transportation Co. in the same manner as that company owned the stock of other nonutility companies—Mystic Steamship Co., New England Coal & Coke Co., Castner, Curran & Bullitt, Inc., and Mystic Iron Works.

From January 1, 1927, to and including November 30, 1933, C. C. B. Smokeless Coal Co. (Mass.) operated the six properties here involved. From the latter date to and inclusive of March 30, 1936, through successive exchanges, the aforesaid six C. C. B. Smokeless properties

came into ownership of the petitioner herein. The parties agree that all these successive exchanges were nontaxable and that the basis of these properties to petitioner for depletion and depreciation is the same as that to the C. C. B. Smokeless Coal Co.

OPINION.

In determining the deficiency respondent has allowed to the petitioner, as a basis for computing depletion and depreciation with respect to the properties of the six West Virginia coal companies acquired, the same basis that such properties had in the hands of the original predecessor corporate owners, increased by additions made since the acquisition in 1926. In so doing he has treated the acquisition by petitioner's predecessor, Massachusetts Gas Companies, of the stock of each of the six companies in question as a transaction separate and distinct from those whereby the physical assets of those companies were later liquidated to a subsidiary corporation of the purchaser. Respondent insists that the evidence shows that, although Massachusetts Gas Companies originally had a purpose of acquiring the assets of the six West Virginia companies and made an offer for those assets, it changed that plan to one of acquiring the stock for a consideration of $7,600,000, because it was unable to buy the assets because of the refusal of the corporations to sell them. It is argued that this was no more than an investment by Massachusetts Gas Companies in the stock of the six coal companies; that later, toward the close of the same year, Massachusetts Gas Companies conceived a new plan of organizing a new wholly owned corporation and vesting it with the assets in exchange for its capital stock, which was and is to be treated as separate and distinct from the original purchase of the stock of the six companies; that it constituted a nontaxable reorganization under which the newly organized subsidiary took the assets of the six corporations in exchange for all of its capital stock; that, consequently, its cost basis for such assets was the same as that of the six predecessor corporations and that this basis continued in the petitioner corporation, since it is not questioned that the subsequent liquidations, as a result of which these assets came into ownership of petitioner, were nontaxable.

Petitioner argues that its predecessor, Massachusetts Gas Companies, at no time had planned to invest in the stock of the six West Virginia companies and that its sole purpose was to acquire the physical coal properties and leases belonging to those companies and to place the ownership of these properties in a wholly owned subsidiary organized by it to operate them. It is contended that the acquisition of the stock of the six companies for a consideration of $7,600,000 in cash was merely the first step in a series of planned,

integrated transactions, the only intended result of which was the acquisition of the physical properties. Upon this premise it is argued that the rule requires that the picture be approached realistically as a single unit, that these several transactions must be considered as one and its tax character and effect determined by the result planned and actually accomplished.

There seems to be no doubt that, if these several transactions were in fact merely steps in carrying out one definite preconceived purpose, the object sought and obtained must govern and the integrated steps used in effecting the desired result may not be treated separately for tax purposes either at the instance of the taxpayer or the taxing authority, or by agreement between both. *Commissioner* v. *Ashland Oil & Refining Co.*, 99 Fed. (2d) 588; certiorari denied, 306 U. S. 661; *Prairie Oil & Gas Co.* v. *Motter*, 66 Fed. (2d) 309; *Tulsa Tribune Co.* v. *Commissioner*, 58 Fed. (2d) 937; *Anheuser-Busch, Inc.*, 40 B. T. A. 1100; affd., 115 Fed. (2d) 662; certiorari denied, 312 U. S. 699; *Ahles Realty Corporation* v. *Commissioner*, 71 Fed. (2d) 150; certiorari denied, 293 U. S. 611; *Illinois Water Service Co.*, 2 T. C. 1200. This is only an application of the general rule that taxation is a practical matter dealing not with mere form, but with realities. This rule was reaffirmed in the recent decisions in *Commissioner* v. *Court Holding Co.*, 324 U. S. 331, and *Meurer Steel Barrel Co.* v. *Commissioner*, 144 Fed. (2d) 282; certiorari denied, 324 U. S. 860; *Allen* v. *Trust Co. of Georgia*, 326 U. S. 630.

Respondent does not deny the correctness of the rule, but, as we understand it, argues that the evidence here is insufficient to show that the several transactions were in reality merely steps in the performance of a definitely preconceived and adopted plan. Consequently, the answer to these arguments rests upon the resolution of what is actually a question of fact, namely, whether petitioner's predecessor, Massachusetts Gas Companies, in acquiring the stock of the six West Virginia coal companies, did so with the purpose not of making an investment in such stock, but as the first step in a plan to acquire the physical properties and leases of those companies, and, if so, whether that plan was adhered to and the later transactions whereby ownership of the physical assets was placed in a subsidiary corporation organized to operate the properties were transactions carrying through to its intended conclusion the adopted plan.

The cited case of *Commissioner* v. *Ashland Oil & Refining Co.*, *supra*, upon which petitioner relies, has many features of resemblance to those in the case at bar. There the taxpayer, then known as the Swiss Oil Corporation, found that the acquisition of additional operating properties was essential to the carrying on of its business and therefore undertook, through certain third parties, to acquire the physical

properties of the Union Oil Co. That company, like the West Virginia companies here, was unwilling to sell its physical properties because of the tax on the corporation upon the gain from the sale and the additional tax upon the stockholders upon liquidation to them of the proceeds of the sale. Finally an option was procured and exercised for the purchase of the stock of the Union Oil Co. at a stated figure. The contract provided that the stock be placed in escrow and that the operation of the properties be continued by Union Oil until there was accumulated $1,000,000 from such operation for payment on the purchase price, at which time the stock was to be turned over to the purchaser and a note for the balance of the purchase price, secured by a mortgage on the corporate property, was to be delivered to the sellers. In performance of this contract the Union Oil Co. continued in existence and operated the properties for approximately a year, at the end of which time the stock was delivered and the purchaser distributed the physical properties to itself in liquidation. The question there was whether the liquidation of the physical properties to the owner of the stock was to be treated for tax purposes as a separate transaction from the purchase of the stock. If so, it was a taxable transaction with a profit resulting in the amount of the difference between the cost of the stock and the value of the assets when liquidated. This value was largely in excess of the cost of the stock. On these facts we held that it was insufficiently shown that the original acquisition of the stock was part of a plan which contemplated only the acquisition of the physical properties. This was primarily due to the fact that the contract of sale required the continued operation of the old company for an indefinite period until $1,000,000 in profits was accumulated. We also noted the fact there that the purchase of the stock effected the acquisition of the corporation as it stood, since it continued to be liable for its existing indebtedness. However, on appeal our decision was reversed. The Circuit Court held that the original intention to acquire the assets was clearly established and that the delay of approximately a year in the liquidation of the corporation did not negative a continued intention on the part of the purchaser of the stock to take over the assets, since the liquidation occurred immediately after the bar preventing it was withdrawn. The Circuit Court held that the two transactions were but steps in a general plan for the acquisition of the assets of Union Oil and that the liquidation of the assets to the purchaser of the stock was merely the concluding step in the purchase of the assets.

In the present case the facts supporting the position of the petitioner go far beyond those relied on by petitioner in *Commissioner* v. *Ashland Oil & Refining Co.*, *supra.* Here it is conclusively established that the original intention of the petitioner was to acquire only the

physical properties of the six coal companies. And the conditions of the contract under which the stock was acquired, together with the action of petitioner subsequent to its acquisition, compel the conclusion that the original plan was unchanged. Thus, we see that, although the stock of the six corporations was acquired, these corporations were first stripped of all their properties except the physical assets desired by the purchaser. Not only was this done, but the selling stockholders assumed all corporate liabilities of every kind arising through anything transpiring prior to the sale. It is admitted by stipulation that, imme-diately upon acquisition of the stock of the six corporations, negotiations were initiated by the purchaser to secure the consent of the lessors to the transfer of the leases held by the several corporations and that such consents were secured and the transfer of the properties was effected as soon as this bar to transfer had been removed. This action by the purchaser could not be reconciled with a purpose on its part to invest in the stock of the six corporations and operate them under their existing charters. It is only consistent with the purpose asserted by the purchaser and corroborated by the testimony of its officers and agents that, from the time the original transaction was initiated by the purchaser of the stock until the final transfer of the assets to the C. C. B. Smokeless Coal Co., the plan and purpose to acquire only the physical assets of the six companies were unchanged. We have accordingly found this as a fact.

Petitioner's alternative contention is that, if the series of transactions, beginning with the acquisition of the stock of the six West Virginia corporations for cash and ending with the liquidation of the assets of those corporations to C. C. B. Smokeless Corporation, is not to be taken as one integrated transaction, then each of the series of steps should be considered as separate and distinct. It is pointed out that, if each of such steps is thus treated, the same result will follow. Thus the final transaction, the liquidation of the six corporations and the taking over of their assets by their sole stockholder in exchange for their outstanding stock, would be a taxable transaction, with recognized gain or loss measured by the difference between the cost to C. C. B. Smokeless of their stocks and the value of the assets acquired in exchange. There is no question that the cost basis to C. C. B. Smokeless of the *stocks* of the six West Virginia corporations was $7,600,000. The respondent does not contend otherwise. This amount in cash was paid for the stocks by Massachusetts Gas Companies, which at once transferred the stocks to its subsidiary, the New England Fuel & Transportation Co., for $7,600,000 par value stock of the latter company. This transfer was a completed reorganization under section 203 (b) (2) and (3) of the Revenue Act of 1926. New England Fuel & Transportation Co. thus took the stocks at their cost to the trans-

feror of $7,600,000. It thereupon transferred the stocks, plus $100,000 to cover cost of clearing titles and legal fees of organization, to C. C. B. Smokeless for all of the latter's issued stock of $7,700,000 par value. This was similarly a reorganization under the cited section, and C. C. B. Smokeless took the cost basis of its transferor for the stock. The parties stipulate that the assets of the six corporations and, consequently, the stocks representing them, did not change in value between the dates of their acquisition by Massachusetts Gas Companies and the transfer to C. C. B. Smokeless. There is no dispute between the parties as to the cost of the stocks to C. C. B. Smokeless. The only question is the cost basis of the *assets* of the six corporations to C. C. B. Smokeless after distribution of them in the liquidation of the six companies.

If the liquidation of the six corporations and distribution of their assets to their sole stockholder, C. C. B. Smokeless, is to be considered as a separate and distinct transaction and not an incident of the reorganization accomplished in the acquisition of these stocks by the latter in exchange for its stock, then it was a pure liquidation, with recognized gain or loss measured by the difference between the cost of the stocks and the value of the assets, and the value of these is the price paid for the stock, since this price was paid after stripping the corporations of all other assets and all liabilities.

Prior to the enactment of section 112 (b) (6) of the Revenue Act of 1936, permitting nontaxable liquidation of a subsidiary corporation, such a liquidation resulted in deductible loss or taxable gain in the amount of the difference between the cost to the parent corporation of the stock and the value of the assets received. *Riggs National Bank*, 17 B. T. A. 615; affd., *Burnet* v. *Riggs National Bank*, 57 Fed. (2d) 980; *Burnet* v. *Aluminum Goods Manufacturing Co.*, 287 U. S. 544; *Warner Co.*, 26 B. T. A. 1225; C. B. XII–1, p. 75. Thus, if the liquidation of the assets of the six West Virginia corporations to C. C. B. Smokeless was a taxable transaction, the latter company would take them at their fair market value or $7,600,000.

As to this alternative contention, we must admit that we see just as much reason to segregate and treat separately the final transaction as the first. The acquisition by New England Fuel & Transportation Co. of the stock of the six corporations in exchange for its capital stock was unquestionably a complete reorganization under section 203 (b) (2) of the Revenue Act of 1926. Likewise, the acquisition of those stocks by C. C. B. Smokeless in exchange for its stock was a completed reorganization under the cited section. The subsequent liquidation of the assets of the six corporations was in no sense necessary to complete that organization. See *Liquidating Co.*, 33 B. T. A. 1173. C. C. B. Smokeless was at liberty to hold the stock of the six corpora-

tions and maintain them as operating entities. There appears to be no more reason, in this record, to hold that the organization of C. C. B. Smokeless and the vesting it with the assets of the six companies was a *new plan* conceived after the original acquisition of the stock of those companies by Massachusetts Gas Companies than to hold that the liquidation of the assets of the six companies to C. C. B. Smokeless was a new plan conceived by it after receiving the stocks of those companies in a nontaxable reorganization.

It should be kept in mind that this is not a case in which the taxpayer is attempting to get a "stepped up" basis for the assets in question. It actually paid $7,600,000 in cash and as a result of that payment received nothing more than the assets in question.

Thus, we think that either way the present series of transactions is viewed, whether as one integrated transaction or as separate and distinct transactions, each with an individual tax significance, the same result follows. We accordingly hold that the cost basis of these properties to petitioner is $7,600,000, plus cost of subsequent additions.

## *Issue 2.*

The question here is whether interest of $27,101, paid by petitioner in 1936, and interest of $11,434.61, paid by petitioner in 1937, both amounts representing interest upon deficiencies in Federal income tax determined with respect to predecessor corporations and for which petitioner was liable as transferee or successor in consolidation, are allowable deductions in computing petitioner's taxable net income for the years in which paid.

### FINDINGS OF FACT.

The facts pertinent to this issue are stipulated and so found. Only so many of the stipulated facts as are necessary to an understanding of the issue are set out hereinafter.

The petitioner was organized pursuant to an agreement of consolidation dated February 24, 1936, and recorded March 30, 1936, among Koppers Coal & Transportation Co., Massachusetts Coal Co., Koppers Stores, Inc., Houston Collieries Co., and Elkhorn Piney Coal Mining Co. This consolidation was effected pursuant to the General Corporation Laws of the State of Delaware.

In the year 1936 petitioner paid certain deficiencies in Federal income tax, together with interest thereon, of $27,101, and in 1937 paid certain deficiencies, together with interest thereon, of $11,434.61. The total of the deficiencies paid in each year was made up of various deficiencies determined with respect to predecessor corporations of the petitioner for the debts of which it was liable by operation of law.

Certain of the deficiencies were determined as to corporations which had consolidated under the agreement of February 24, 1936, and some of them were with respect to certain predecessor corporations of the consolidating corporations for the indebtedness of which the consolidating corporations were liable as transferees.

The parties have stipulated the amount of the deficiencies and interest thereon in the case of each corporation and the date of its liquidation or consolidation.

OPINION.

The question for our decision is whether the interest payments in question were interest upon the indebtedness of petitioner.

We think the answer, in so far as it concerns interest on tax deficiencies determined against the consolidating corporations, is controlled by our recent decision in *Adrian & James, Inc.*, 4 T. C. 708. In that case a consolidation was effected under the same statute here involved. We held that the corporation emerging from the consolidation was not a transferee, but was in fact the predecessor corporations, that the income tax liabilities of such corporations were consequently the indebtedness of the new corporation, and that in paying such indebtedness it was not satisfying the indebtedness of another.

The item of the interest here in controversy arose upon the income tax deficiencies of the consolidated corporations. Under the rule in the cited case, such deficiencies constituted the indebtedness of the petitioner, and interest paid thereon is interest upon its indebtedness. Upon this issue we sustain the petitioner.

With respect to that portion of the interest paid which pertained to deficiencies determined against certain corporations which were transferors of the consolidating corporations, we hold that petitioner is entitled to deduct only so much thereof as accrued subsequent to the several transfers. *Koppers Co.*, 3 T. C. 62; affd., 151 Fed. (2d) 267.

*Issues 3, 4, 5, and 6.*

The parties have settled the above issues by stipulations. We include these stipulations by reference and they will be given effect upon recomputation of the deficiencies under Rule 50.

*Issue 7.*

The question here is whether petitioner is entitled to deduct for the year 1936 the sum of $5,200 as a loss not compensated for by insurance, or otherwise, through the destruction by fire of a store building owned by it at Smithers, West Virginia. The facts are stipulated, but need

not be set out, as respondent, upon brief, concedes this issue and upon recomputation under Rule 50 petitioner will be allowed a deduction of $5,200 for the year 1936 on account of the loss in question.

### Issues 8 and 9.

The two questions here are whether petitioner is entitled to deduct, for the year 1936, $694.11 representing a deficiency in transportation tax and interest thereon asserted against it by the State of West Virginia for that year, and to deduct for 1937 the sum of $840.39 representing a similar assessment of transportation tax and interest for that year.

#### FINDINGS OF FACT.

During the years 1934 and 1935 and the period January 1 to March 30, 1936, the Elkhorn Piney Coal Mining Co. was engaged in the business, among others, of operating coal mines in the State of West Virginia. On the latter date the Elkhorn Piney Coal Mining Co. and other corporations were consolidated into petitioner, which thereafter continued operation of the mines in question.

The Elkhorn Piney Coal Mining Co. and petitioner purchased buses which were used to supply bus transportation to their employees at some of their mines in West Virginia. It was essential to the operation of the mines that transportation be furnished to the employees, many of whom lived some distance from the mines. Upon purchase, arrangement was made with two individuals for the operation of the buses by a contract under which the buses were sold to these individuals, who thereupon operated them and made a charge to the individual workers transported. The revenue thus produced was used by the individuals to pay the consideration for which the buses had been sold to them. This arrangement was made by Elkhorn Piney and petitioner for the reason that they did not wish to operate the buses themselves and thus assume financial responsibility toward the passengers. The operation of the buses by the two individuals was never a financial success and they made little more than was necessary to make their payments to Elkhorn Piney and petitioner for the buses. The two individuals possessed no independent means other than that represented by the operation of the buses.

The State of West Virginia, under its transportation law, demanded a tax for the operation of these buses in such transportation and asserted deficiencies for the years 1934 to 1939, inclusive, which, together with interest thereon, amounted to a total of $3,999.20, $694.11 of which represented tax and interest for 1936, and $840.39, the tax and interest for 1937.

Elkhorn Piney Coal Mining Co. and petitioner both took the position

that the tax liability was not theirs, but was that of the individual owners and operators of the buses, and that the tax should be collected from them. Finally, after negotiation and consideration of the fact that the tax could not be collected by the State of West Virginia from the two individuals because of their inability to pay and that if unpaid it would result in a denial by the state of the asserted right to continue the operation of the buses, petitioner, in 1940, for these reasons agreed to pay the taxes and interest thereon and in accordance therewith filed tax returns with West Virginia state authorities for the years 1934 to 1939, stating on such returns that they were made for the account of the operators of the buses. In 1940 petitioner paid to the State of West Virginia the aforesaid total sum of $3,999.20, transportation tax, together with additional interest accumulated thereon in the amount of $640.33. This amount the petitioner deducted upon its income tax return for 1940. Such deduction was disallowed by the respondent for the stated reason that petitioner was on the accrual basis and consequently could not deduct taxes and interest thereon in 1940 for the years 1934 to 1939, inclusive.

OPINION.

Petitioner contends that if the payment made in 1940 does not represent an item deductible in that year, it is entitled to accrue in 1936 and 1937, the years before us, those portions of the total amount pertaining to those years.

It is difficult to reconcile many of the decisions with respect to the right of accrual, under various circumstances, of amounts representing taxes and interest thereon. However, since the decisions of the Supreme Court in *Dixie Pine Products Co.* v. *Commissioner*, 320 U. S. 516, and *Security Flour Mills Co.* v. *Commissioner*, 321 U. S. 281, the rule is settled that, so long as liability to pay the charge is denied and contested, no basis for accrual exists. *Great Island Holding Corporation*, 5 T. C. 150.

Here it is shown not only that petitioner denied and contested liability for the tax when proposed, but it did not admit liability even upon its ultimate payment. It filed returns and made the payment in 1940 as on account of the two individual operators of the buses. Under such conditions, no basis whatsoever existed for an accrual by petitioner of any portion of the payment in the years 1936 and 1937. We hold against petitioner upon this issue.

*Issues 10 and 11.*

The questions here are whether petitioner is entitled to deduct Pennsylvania income taxes and interest thereon for the years 1936 and 1937.

FINDINGS OF FACT.

Petitioner has had an extended controversy with the taxing authorities of the Commonwealth of Pennsylvania with respect to Pennsylvania corporate income tax for the years 1935 to 1941, inclusive.

For the year 1935 and the first three months of 1936, the controversy concerned three of petitioner's component corporations, to wit, Elkhorn Piney Coal Mining Co., Houston Collieries Co., and Koppers Coal & Transportation Co. The Pennsylvania taxing authorities contended that these companies and petitioner, as their successor, owed additional state income taxes for the year 1935 and the first three months of 1936. Petitioner contested the asserted Pennsylvania income tax deficiencies for the year 1935 and the first three months of 1936.

After March 1936 and through 1941, petitioner filed state returns and paid certain amounts of such state income tax. Petitioner knew that the tax computations shown on its state returns were not in accord with the position currently being taken by the state taxing officials, but the matter was in a state of litigation in other cases then pending in the Pennsylvania courts and there was no assurance as to the correct formulae for computing the tax. At all times during the years 1936 to 1939, inclusive, the matter of the liability of petitioner and its predecessor companies for additional Pennsylvania income taxes was unsettled.

In December 1943, the state taxing authorities issued determinations showing Pennsylvania corporate income tax liability of petitioner as follows:

| | |
|---|---:|
| 1936 | $5,459.32 |
| 1937 | 5,125.52 |
| 1938 | 1,646.61 |
| 1939 | None |

The state taxing authorities and petitioner reached tentative agreements covering the state income tax liability of the three predecessor companies for the year 1935 and the first three months of 1936 as follows:

Elkhorn Piney Coal Mining Co.:

| | | |
|---|---:|---|
| 1935 | $2,929.60 | Tentative agreement reached in 1941 |
| 1936 (first 3 months) | 1,789.20 | |

Houston Collieries Co.:

| | | |
|---|---:|---|
| 1935 | 1,323.05 | Tentative agreement reached in 1937 |
| 1936 (first 3 months) | 2,941.26 | Tentative agreement reached in 1939 |

Koppers Coal & Transportation Co.:

| | | |
|---|---:|---|
| 1935 | 3,299.16 | Tentative agreement reached in 1937 |
| 1936 (first 3 months) | none | Tentative agreement reached in 1943 |

The aforesaid determinations and agreement with respect to such Pennsylvania income taxes represent final settlements by the Department of Revenue of the Commonwealth of Pennsylvania, except for

the fact that the settlements are subject to such adjustments as may result from the Tax Court's determination, in proceedings pending before it, of the net incomes and tax liabilities for the years 1935 and 1936 of Elkhorn Piney Coal Mining Co., Houston Collieries Co., and Koppers Coal & Transportation Co. (this includes unjust enrichment taxes), as well as income taxes and the net incomes and tax liabilities of petitioner for the years 1936 and 1937. The settlements are also subject to such adjustments as may result from the Treasury Department's action on claims for refund of income tax for the years 1935 and 1936 filed for Koppers Coal & Transportation Co.

In the ascertainment of such Pennsylvania income tax due, the computation begins with the Federal net income to which certain adjustments are made. This adjusted amount is then allocated between the income resulting from business in and that done outside of Pennsylvania. A proper computation of the Pennsylvania income tax is the result of a formula which takes into consideration all adjustments for both Federal and Pennsylvania tax purposes. The final computation of the Pennsylvania income tax depends upon the final determination of the net income and tax liability due the Federal Government.

These Pennsylvania income taxes for the year 1935 bear interest at the rate of 12 percent per annum from their due date to the date of payment thereof. Such taxes for the year 1936 bear interest at the rate of 6 percent per annum from the date the tax was due until 60 days after date of settlement, and thereafter at the rate of 12 percent per annum until paid.

No amount has been allowed petitioner as a deduction for 1936 or 1937 for such additional Pennsylvania income tax and interest thereon.

The controversy between the parties hereto, under issue No. 10, relates solely to whether additional Pennsylvania income taxes "accrued" within petitioner's taxable years 1936 and 1937, as that word is used in section 23 of the Revenue Act of 1936. The controversy between the parties, under issue No. 11, relates only to whether interest on any additional Pennsylvania income taxes "accrued" within the years 1936 and 1937, as that word is used in section 23 of the Revenue Act of 1936. The parties agree (subject to the approval of the Court) that upon the Court's determining the matters in controversy the additional deductions, if any, for the years 1936 and 1937, will be computed under Rule 50 of the Court's Rules of Practice.

OPINION.

The issues here are determined by the answer to the inquiry as to whether or not at the close of each of the taxable years 1936 and 1937 the conditions existing with respect to additional income taxes for those years were such as to permit their accrual by petitioner.

On this question the facts established disclose that the additional income taxes in question were not even tentatively determined by the State of Pennsylvania until some years after the close of the taxable years here involved; that they are not yet finally determined in amount; and that for long after the close of the taxable years involved liability for the tax and interest was not only not admitted by petitioner, but was contested by it.

The questions are thus the same as those presented under issues 8 and 9. The same answer therefore follows. No basis existed at the close of 1936 and 1937 for the accrual and deduction by petitioner of the items here involved. *Dixie Pine Products Co.* v. *Commissioner, supra; Security Flour Mills Co.* v. *Commissioner, supra.*

## Issues 12 and 13.

The questions here are whether petitioner is entitled to deduction for 1936 and 1937 of the amounts representing Pennsylvania franchise taxes and interest thereon. The facts are stipulated and we include the stipulation by reference as our findings of fact.

### FINDINGS OF FACT.

Briefly stated, certain of the corporations which were consolidated into petitioner in March 1936 were charged by the State of Pennsylvania with liability for franchise taxes for the year 1935 and the period from January 1, 1936, until the date of their consolidation. After petitioner came into existence through the consolidation in March 1936, it filed for the balance of that year and succeeding years state franchise tax returns and paid the tax shown thereon. The Pennsylvania taxing authorities contended that the petitioner owed additional state franchise taxes for the years 1936 to 1939, inclusive, but petitioner contested the proposed liability for such taxes during this time. The question of liability and amount thereof was not finally determined until April 1944.

### OPINION.

The questions here are similar in all respects to those involved under the four prior issues. For the reasons and upon the authorities there stated, we hold that at the close of 1936 and 1937 existing conditions precluded the accrual of that portion of the franchise taxes for those years then in dispute. We hold petitioner is not entitled to accrue and deduct these items for 1936 and 1937.

## Issues 14 and 15.

The questions here are whether petitioner is entitled to additional deductions for 1936 and 1937 for city of New York sales taxes and interest thereon.

The parties stipulated the facts to be as follows:

Petitioner and its successor, Eastern Gas & Fuel Associates, had an extended controversy with the taxing authorities of the city of New York with respect to city of New York sales taxes.

All city of New York sales taxes bear interest at the rate of 6 percent per annum from their due date to the date of payment thereof.

The controversy relative to the liability of the petitioner for city of New York sales taxes with interest thereon did not arise until after the year 1939.

In 1943 the city of New York made assessments of city sales taxes, with interest thereon, against petitioner as follows:

| Company making sale | Year of sale | Sales tax assessed | Interest assessed | Total assessed |
|---|---|---|---|---|
| Koppers Coal Co | 1936 | $328.44 | $137.94 | $466.38 |
| Do | 1937 | 469.92 | 172.70 | 642.62 |
| Do | 1938 | 404.04 | 124.24 | 528.28 |
| Do | 1939 | 424.52 | 105.07 | 529.59 |
| Do | 1940 | 237.30 | 48.06 | 285.36 |
| Predecessors of Koppers Coal Co | 1935 | 84.03 | 41.09 | 125.12 |
| Do | 1936 | 24.56 | 11.05 | 35.61 |
| Total | | 1,972.81 | 640.15 | 2,612.96 |

These assessments were paid by Eastern Gas & Fuel Associates, petitioner's successor, in the year 1943.

Petitioner and its named predecessor companies were the vendors of the articles with respect to which said city of New York sales taxes were imposed.

No part of the aforementioned city of New York sales taxes or of the interest thereon was allowed by the Commissioner as a deduction for the years 1936 to 1939, inclusive.

The controversy between the parties hereto under issue No. 14 relates solely to whether city of New York sales taxes "accrued" against petitioner within petitioner's taxable years 1936 and 1937, as that word is used in section 23 of the Revenue Act of 1936, on sales made in 1936 and 1937. The controversy between the parties under issue No. 15 involves only the question whether interest on city of New York sales taxes "accrued" against petitioner within petitioner's taxable years 1936 and 1937 as that word is used in section 23 of the Revenue Act of 1936. The parties agree (subject to the approval of the Court) that upon the Court's determining the matters in controversy, the amounts of city of New York sales taxes and interest thereon, if any, allowable as deductions, will be computed under Rule 50 of the Court's Rules of Practice.

OPINION.

It appears that the controversy with respect to the item of additional sales taxes and interest for the years 1936 and 1937 did not

even arise until 1939, when these additional taxes were first proposed. They were then contested by petitioner and the contest was not concluded until 1943. We must accordingly hold under the rule laid down in *Dixie Pine Products Co.* v. *Commissioner, supra,* and *Security Flour Mills Co.* v. *Commissioner, supra,* that there was no basis at the close of either of the taxable years 1936 and 1937 for an accrual of the items here claimed as deductions.

### Issue 16.

The question here is whether petitioner is entitled to an additional deduction in 1937 for interest which it may be required to pay on deficiencies in income and unjust enrichment taxes for the year 1936, if a deficiency is determined for that year in such taxes as a result of this proceeding.

#### FINDINGS OF FACT.

If a deficiency in petitioner's tax is determined in this proceeding for the calendar year 1936, it will bear interest from March 15, 1937, and a certain definite amount of that interest will be applicable to the period measured by the close of that year. Petitioner claims the right to the accrual for that year of the amount of this interest and to the deduction of this item in computing net income for that year.

#### OPINION.

It need only be said that petitioner's liability for additional Federal taxes for 1936 is now being actively contested. On authority of the decisions hereinbefore cited, we hold that petitioner is not entitled to the accrual and deduction of the item in question.

### Issue 17.

#### OPINION.

The facts here are stipulated and the question is identical with that presented under the foregoing issue, except that petitioner here claims a right to accrue and deduct for 1936 and 1937 such interest as may be computed upon deficiencies determined in other proceedings pending before the Court involving certain of its predecessor corporations. If deficiencies are determined in those proceedings, they will carry interest and such interest will be paid by petitioner. It is the portion of such interest applicable to the deficiencies for the years 1936 and 1937 that petitioner seeks to accrue and deduct in determining its net income for those years.

It also seeks deduction, for 1936 and 1937, of interest applicable to those years and paid by it, or its successor, in 1941 and 1942 on defi-

ciencies determined against several corporations, of which petitioner was the transferee.

The several corporations involved and the amounts of the deficiencies and interest thereon are stipulated and need not be set out here. The facts clearly reveal that, under the rule applied in the immediately preceding issues, there was no basis at the close of the taxable years 1936 and 1937 for an accrual of the items, deduction of which is sought by petitioner.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

MURDOCK, *J.*, concurring: I disagree with the reasoning to the effect that assets were bought despite the refusal of the five corporations to sell their assets. However, the alternative line of reasoning, with which I agree, gives the same basis for the assets in question.