OPINION. Kern, Judge: When the course of dealings between Granberg and petitioner relating to the first issue is subjected to the scrutiny which such transactions require, cf. Twin City Tile & Marble Co. v. Commissioner (CCA-8), 32 Fed. (2d) 229, and Gould Merserau Co., 21 B. T. A. 1316, it is at once apparent that form and substance are not one and the same. And substance must control. Limericks, Inc. v. Commissioner (CCA-5), 165 Fed. (2d) 483. “In tax matters the realities of a transaction, not artificialities, are given effect.” Nordling v. Commissioner (CCA-9), 166 Fed. (2d) 703. Although the parties argue whether petitioner owned equitably or otherwise the five inventions from the outset, or at least when they were later absolutely assigned to it, we need not resolve that question. We believe that the first issue raised in this proceeding can be decided on the narrower ground, also urged by respondent, of whether the retroactive payment of royalties for the year 1943 by petitioner to Granberg and other of its stockholders was an ordinary and necessary business expense. Respondent contends that the payment was not in reality the payment of royalties, but, to the contrary, was in reality the distribution of a dividend. We agree with respondent that it was not in reality the payment of an ordinary and necessary business expense, and that the claimed deduction was nothing more than an attempt to disguise a dividend distribution. Accordingly, it is not deductible for tax purposes.[1] The picture petitioner seeks to create is not convincing, to say the least. From the time of petitioner’s inception until the end of the tax years involved, all of the events point to a lack of arm’s length dealings between Granberg and petitioner. Motives other than the necessities of the business dictated the form of transactions which would not have been entered upon by unrelated persons. Wilhelmina Dauth, 42 B. T. A. 1181. Hence, it is not surprising that minutes of alleged meetings speak of events occurring after the dates upon which the meetings were supposed to have been held. It is not surprising that when petitioner’s and Granberg’s attorney, who incorporated the business and who was apparently quite familiar with all of its activities and operations, submitted his draft agreement in August 1943, there were included in it inventions that Granberg did not invent and others that even petitioner concedes had been unconditionally assigned to it prior thereto. It is not surprising that documentary evidence and oral testimony do not coincide. Granberg himself testified that a royalty agreement was not to be executed until petitioner had reasonable opportunity to determine the marketability of the five inventions and the soundness of any investment in them. Yet, as of the close of 1943, petitioner and Granberg must have fully realized that this time had not yet arrived. Sales of products under these inventions were exceedingly small. Plans for augmenting production had to be abandoned, and there was no likelihood that at any reasonable future time significant production could be undertaken. In fact, only one of the inventions had then been patented, and application for another had not even been made until the summer of 1943. Petitioner has not shown that it could not have obtained the license agreement, if one were even necessary, without making the minimum royalty retroactive. It is inconceivable why at the end of 1943 petitioner would encumber itself under such agreement at all, when opportunity to exploit the inventions during the war period had almost entirely faded. The minutes of the corporate meetings can be viewed only in the setting of all of the dealings between the parties. Even if such meetings were held and the business transacted was accurately reported in the minutes, they would serve no more than to lend weight to the lack of arm’s length negotiations and expose the total lack of business reality in the transactions relating to the retroactive payment of the so-called royalties. Not only the steps leading to the execution of the agreement, but the agreement itself, demonstrates that all were incidents of an artificial maneuver to avoid taxes. Few provisions protecting petitioner’s interests were included, whereas an inordinately high minimum royalty was established. On its face it appears to be an agreement that parties dealing at arm’s length would not have formulated. “Surely, [the royalty] is not an ordinary and necessary business expense of carrying on petitioner’s trade or business. Except for the close relationship of the parties, it seems hardly conceivable that such an agreement would ever have been entered into.” Eskimo Pie Corporation, 4 T. C. 669, 677; affd. (CCA-3), 153 Fed. (2d) 301. It is significant that the so-called “royalty” was payable to the stockholders in almost the same percentage that their stockholdings bore to petitioner’s total stock as of the end of 1941. W. N. Thornburgh Mfg. Co., 17 B. T. A. 29. There were variations as of the 1943 stockholdings, but that would not be sufficient to defeat the characterization of the payment as dividends; nor also would the absence of a formal declaration of dividends. Joseph Goodnow & Co., 5 B. T. A. 1154, Forcum-James Co., 7 T. C. 1195. The only available explanation for such course of dealings as here evidenced is that the purpose of saving taxes — particularly petitioner’s excess profits taxes — led the interested parties to embark on the unrealistic scheme followed. See W. N. Thornburgh Mfg. Co., supra. What we said in Ingle Coal Corporation, 10 T. C. 1199, is pertinent here: No authority is needed for the statement that the mere designation of the payments as royalties does not legally characterize them as such. Nor does the fact that the written obligation of the petitioner might, at least under some circumstances, have compelled their payment by the petitioner. Interstate Transit Unes, 44 B. T. A. 957; affd., 130 Fed. (2d) 136; affd., 319 U. S. 590. The question is whether, in fact, the payment was a deductible expense, as a royalty or otherwise, under the controlling statute. The answer to this question is, of course, purely factual. In our opinion, the contested payments were neither royalties nor ordinary and necessary expenses, and therefore, they are not deductible. The series of transactions between the * * * corporations and the stockholders •* * * were obviously not at arm’s length. * * * The series of transactions constituted integrated steps in a single plan and must be so considered for tax purposes, which resulted in an unnecessary “obligation” upon the part of petitioner to pay the so-called overriding “royalty.” Commissioner v. Ashland Oil & Refining Co., 99 Fed. (2d) 588; certiorari denied, 306 U. S. 661; Diescher v. Commissioner, 110 Fed. (2d) 90; certiorari denied, 310 U. S. 650; Helvering v. Alabama Asphaltic Limestone Co., 315 U. S. 179; Heller v. Commissioner, 147 Fed. (2d) 376; certiorari denied, 325 U. S. 868; Hoppers Coal Co., 6 T. C. 1209. We think, under the circumstances, the payment of this * * * overriding “royalty” was a distribution of corporate profits to the stockholders receiving the same and therefore was not a deductible expense, either as a “royalty” or otherwise. See also Atlantic Monthly Co., 5 T. C. 1025. The cases cited to us by petitioner, of which Webb Press Co., Ltd., 3 B. T. A. 247, and Buffalo Eagle Mines, Inc., 37 B. T. A. 843, are examples, are clearly distinguishable in that in all of those cases bona fide arrangements were involved. The tax effect of these arrangements for years subsequent to 1943 is not before us, and we express no opinion with reference to that matter. On this issue, respondent’s determination is sustained. The second issue raises the question of whether petitioner is precluded from deducting in 1942 a bonus payable to Granberg, which it entered on its books in February 1943 under the terms of section 24 (c) of the Internal Revenue Code.[2] “It is well established that all three conditions set forth in section 24 (c) must coexist in order to make that section operative.” Akron Welding & Spring Co., 10 T. C. 715, 720. Petitioner concedes the applicability of clauses 2 and 3, but contends that the conditions set out in clause 1 are not satisfied, and the deduction should, consequently, be allowed. Petitioner argues that the bonus was constructively received by Granberg in February 1943, when it was credited to his account on the books of petitioner, that it was therefore constructively paid by petitioner within two and one-half months after the close of 1942, and that therefore there was an expense “paid” within the meaning of clause (1) of section 24 (c). We disagree with each step in petitioner’s argument. In order to prove that the bonus was constructively received by Granberg in February 1943, it is necessary that petitioner prove the amount credited to his account was unqualifiedly subject to his demand without restriction as to the time or manner of payment. See John A. Brander, 3 B. T. A. 231; Regulations 111, sec. 29.42-2. Granberg and his wife did not report the bonus as income received by them in 1943. Although he was president, general manager, and principal stockholder of petitioner, and was petitioner’s principal witness at the hearing herein, he was not asked to testify on this issue. Petitioner’s secretary-treasurer testified that he knew of no restriction upon Granberg’s right to withdraw the amount credited to him, but it is apparent from other testimony given by him that his knowledge concerning the granting of bonuses by petitioner was hazy and inconclusive. This being the state of the record, we are not satisfied that Granberg constructively received the bonus in February 1943. Even though there was constructive receipt of the bonus by Gran-berg in 1943, that fact in and of itself does not compel a conclusion that there was constructive payment by petitioner. See Cox Motor Sales Co., 42 B. T. A. 192; P. G. Lake, Inc., 4 T. C. 1; affd., 148 Fed. (2d) 898. And, finally, even though we agreed with petitioner that the crediting of the bonus to Granberg’s account in February 1943 constituted constructive receipt by Granberg, and constructive payment by the petitioner corporation, we would be unable to conclude that there had been a payment by petitioner within the meaning of section 24 (c) (1) of the Internal Revenue Code. The same situation was presented and the same contention was made in P. G. Lake, Inc., supra. That case has not been overruled and is still valid authority for the proposition that “constructive payment” is not a payment within the meaning of section 24 (c) (1) of the code. The cases of Akron Welding & Spring Co., supra; Miller, Inc. v. Commissioner, 164 Fed. (2d) 269; Michael Flynn Mfg. Co., 3 T.C. 932; and Ohio Battery & Ignition Co., 5 T.C. 283, are all distinguishable from and inapposite to the instant case in that in those cases (in so far as they were concerned with section 24 (c) (1), there were not “constructive payments” arising from credits on the books of the corporations, but, to the contrary, there were actual payments made by means of checks or notes which were worth their face amount when executed and delivered by the corporation. On this issue we also decide in favor of respondent. The question as to petitioner’s basis of certain patents can be resolved by using the figures conceded by the parties and stated in our findings of fact. Decision will he entered under Rule 50. In the absence of any basis in the record, we need not speculate as to what, If any, royalty payment might be reasonable for the year under the facts of this case, (c) Unpaid Expenses and Interest. — In computing net income no deduction shall be allowed under section 23 (a), relating to expenses incurred, or under section 23 (b), relating to interest accrued— (1) If such expenses or interest are not paid within the taxable year or within two and one-half months after the close thereof; and (2) If, by reason of the method of accounting of the person to whom the payment is to be made, the amount thereof is not, unless paid, includible in the gross income of such person for the taxable year in which or with which the taxable year of the taxpayer ends ; and (3) If, at the close of the taxable year of the taxpayer or at any time within two and one-half months thereafter, both the taxpayer and the person to whom the payment is to be made are persons between whom losses would he disallowed under section 24 (b).