George Haiss Manufacturing Company v. Commissioner.
George Haiss Mfg. Co. v. Commissioner
Docket No. 56779.
United States Tax Court
T.C. Memo 1957-241; 1957 Tax Ct. Memo LEXIS 9; 16 T.C.M. (CCH) 1106; T.C.M. (RIA) 57241; December 30, 1957
*9 Held, following the principle of Koppers Coal Co., 6 T.C. 1209, Kimbell-Diamond Milling Co., 14 T.C. 74 (C.A. 5, 1951), affd. per curiam 187 Fed. (2d) 718, certiorari denied 342 U.S. 827, and Estate of James F. Suter, 29 T.C. , that the purchase by A corporation of all the stock of B corporation, the contribution of such stock to C corporation and the merger of B into C, were all steps in an integrated plan to purchase assets of B and contribute them to C, and the basis of the assets of B in the hands of C for the purpose of depreciation deductions is the amount paid by A for the stock of B. Fair market value of assets found for purpose of allocation of cost. Held, further, that certain amounts paid by the petitioner pursuant to an "employment contract" in fact constituted additional cost of stock and as such are not deductible as compensation paid. Held, further, that only portions of amounts paid by the petitioner under certain contracts constituted deductible compensation for legal and accounting services. The amounts of such portions found. Held, further, that petitioner has not shown error in the respondent's disallowance *10 as deductions of portions of additions to a reserve for bad debts.
Held, further, that petitioner has not shown error in the respondent's disallowance as a deduction of the cost of certain safety devices. William A. McSwain, Esq. and James O. Silliman, Esq., for the petitioner. Andrew Kopperud, Jr., Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax as follows: Year
Deficiency
Calendar year 1946
$10,663.66
Period Jan. 1, 1947 to March 31, 1947
7,526.06
Fiscal year ended March 31, 1948
36,038.75
Fiscal year ended March 31, 1949
21,310.61
The principal issue is whether a transaction which was in form a purchase of stock was in substance a purchase of assets, the cost of the stock being ascribed as the basis of the assets for the purpose of depreciation deductions. Other issues relate to the deductibility of amounts claimed as compensation paid and of an amount claimed as ordinary and necessary business expense, and the amount of deductible additions to a reserve for bad debts. An issue as to the amount of travel and entertainment expense was conceded *11 on brief by the petitioner. Findings of Fact Some of the facts have been stipulated and are so found, the stipulations being incorporated herein by this reference. The petitioner is a New York corporation organized in 1906. Its principal office is in New York City. It filed its corporation income tax returns for the years involved with the collector of internal revenue for the 14th district of New York. From 1936 to August 22, 1946, all the stock of the petitioner was owned equally by the three Haiss brothers - George E., Alfred W., and Raymond C. It was engaged in the manufacture and sale of materials handling equipment, such as bucket loaders, clamshell buckets, conveyors, and similar products. Its plant was located in New York City. In 1936 the three Haiss brothers organized the GAR Realty Corporation, hereinafter referred to as GAR, each acquiring one-third of the stock. On January 2, 1937, the petitioner conveyed its land and buildings to GAR for a consideration equal to the adjusted basis of these assets on the books of the petitioner. Thereupon GAR leased the land and buildings to the petitioner and monthly rentals were paid. On November 4, 1942, the petitioner conveyed *12 its machinery and equipment to GAR for a consideration of $50,484, although the original cost had been $109,500 and the adjusted basis in the hands of the petitioner was $1,100. Thereupon GAR leased the machinery and equipment to the petitioner and monthly rentals were paid. GAR's business consisted of renting its real estate and machinery, principally to the petitioner. In the 1940's Pettibone Mulliken Corporation, a Delaware corporation, hereinafter referred to as Pettibone, was engaged in Chicago in fabricating steel products by forging, welding, casting, and machining. Among other things it produced construction type of machinery such as shovel and pull-shovel dippers and dragline and clamshell buckets. Its principal products consisted of railroad track equipment. In 1944 it was seeking to diversify its products and its market. In the latter part of 1944, E. Joseph Seifert, the president of Pettibone, chanced upon a construction project utilizing Haiss machinery. He determined that such machinery would be an appropriate addition to Pettibone's line. He arranged to make a visit to the petitioner's plant with the intention of possibly purchasing the business. About April 30, 1945, he *13 was conducted on a tour of the plant and was shown its operations and products. Up to this time Pettibone had confined its operations largely to the mid-west and had relatively little business in the east. It was thought that by acquiring the business of the petitioner it could thereby provide facilities for eastern sales distribution, eastern warehouse, and eastern service. Seifert was under the impression that all phases of the Haiss operations were concentrated in one corporation, the petitioner. It was not until January 1946, after certain financial data was submitted to him with respect to the Haiss operations, that he first became aware of the fact that the fixed assets used in the business were owned by a separate corporation, GAR. Seifert was not interested in carrying on the operation in two separate corporations. Rather, he desired a single integrated manufacturing and sales entity. In negotiations with Seifert the Haiss brothers were represented by Harry W. Stelle, their accountant and attorney. Seifert and Stelle first met in December 1945. They again met on May 13, 1946, and an asking price was first proposed by Stelle for the sale of the stock of both companies, the *14 petitioner and GAR. Seifert told Stelle that Pettibone was not interested in acquiring or operating GAR and that it wanted only the assets consisting of the land, buildings, and machinery. Stelle told Seifert that all he could sell was stock, that he could not offer for sale the land, buildings, and machinery as such, and that if Seifert wanted the assets, he would have to buy the stock of GAR. At their next meeting, June 17, 1946, Stelle reiterated that he could not sell the land, buildings, and machinery of GAR as such and that he could sell only the stock. At that time Seifert made no offer for the purchase of the stock of GAR. Pettibone recognized that the purchase of stock of GAR would present certain tax problems. The fixed assets in the hands of GAR had a low basis for the purpose of depreciation, whereas the actual value of the assets at that time was substantially higher. Pettibone wanted the purchase price of the GAR stock, which was based upon the value of the fixed assets, to represent the cost basis of those assets for purposes of depreciation deductions and computation of gain or loss in the eventuality of any future resale of those assets. Tax advice was given to *15 Pettibone by its counsel and one of its directors, who was an attorney, and such advice was confirmed by its accounting firm. This advice contemplated a plan whereby all the stock of the petitioner and of GAR would be purchased by Pettibone; the GAR stock would be donated to the petitioner; and the petitioner would merge GAR into itself. The tax result anticipated was that the cost to Pettibone of the GAR stock would be treated as the cost basis to be allocated among GAR's assets. This advice was based upon a then recent tax case. ( Koppers Coal Co., 6 T.C. 1209 (May 29, 1946) The plan was discussed and informally approved at a meeting of the board of directors of Pettibone in the latter part of June 1946. At the next meeting of Stelle and Seifert, on July 10, 1946, Seifert reiterated Pettibone's desire to purchase assets of GAR rather than its stock. However, the recent tax case was discussed and Seifert stated that in view of the tax advice received Pettibone would be willing to purchase the stock. At that time Seifert contemplated causing the petitioner to acquire the assets in order that the petitioner, which would be a subsidiary of Pettibone, would then be an integrated *16 manufacturing and sales entity. On July 24, 1946, Seifert presented to Stelle a firm offer of $500,000 for the stock of GAR, based upon a valuation in that amount for the land, buildings, and machinery, subject to some minor adjustments. He offered $450,000 for the stock of the petitioner. He offered to pay for the GAR stock in cash and to pay or cause to be paid for the stock of the petitioner $400,000 in cash and $50,000 by note. Pettibone did not want any of the other assets or liabilities of GAR. They were to be removed by the Haiss brothers before the sale of the GAR stock. This offer was accepted. At a meeting of the board of directors of Pettibone on July 26, 1946, Seifert explained the plan to purchase all the stock of both the petitioner and GAR, and to donate the stock of GAR to the petitioner. A resolution was then adopted authorizing the corporate officers to contract for the purchase of the stock of the petitioner and of GAR for a price not in excess of $950,000. Accordingly, on August 12, 1946, Pettibone entered into agreements with each of the three Haiss brothers for the purchase of all the stock of the petitioner and GAR. In the contracts Pettibone agreed *17 to cause to be paid for the GAR stock a total of $489,000 in cash. On August 22, 1946, this amount was paid in cash by Pettibone, $163,000 to each of the Haiss brothers. In the contract with Alfred W. Haiss, Pettibone agreed to cause to be paid to Alfred, $170,000 in cash for his 750 shares of stock of the petitioner, and this amount was paid by Pettibone on August 22. The contract with Raymond C. Haiss was the same in this respect, but payment was effected in a different way. Pettibone paid him $40,798.19 for 180 shares, and the petitioner paid him $129,201.90 for 570 shares which were thereafter held by the petitioner as treasury stock. In the contract with George E. Haiss, Pettibone agreed to cause to be paid a total of $120,000 for his 750 shares of stock of the petitioner ($51,200 in cash for 320 shares and $18,800 in cash and a note for $50,000 for 430 shares). On August 22 an amount of $70,000 was paid by the petitioner to George in cash, the petitioner issued a note for $50,000 to George, payable on or before two years at four percent interest, and the petitioner received and held the 750 shares as treasury stock. The contract provided that Pettibone should be liable as guarantor *18 on the note and the note was further secured by a second mortgage on the real estate of GAR and a second chattel mortgage on the machinery and equipment of GAR. Each contract with the Haiss brothers contained the following provision.. "Pettibone Mulliken Corporation represents that its sole interest in purchasing the shares of stock of the GAR Realty Corporation is to obtain the physical properties owned by the GAR Realty Corporation, namely: land, buildings, and machinery; that Pettibone Mulliken Corporation has no interest in and to any of the current assets and liabilities of the GAR Realty Corporation other than the liabilities owing to George Haiss Manufacturing Co. represented by unpaid notes that were issued at the time of acquisition of title to the real estate and the machinery and equipment. * * *" In each contract it was agreed that prior to the closing date all the cash, accounts receivable, and other current assets of GAR should be transferred to a trustee who was to liquidate the current assets, pay an existing first mortgage in the sum of $5,000, discharge other current liabilities, and pay any balance to the former stockholders in proportion to their stockholdings. *19 In each contract it was recited that Pettibone had satisfied itself as to the liabilities of both companies, both actual and contingent, and that the individual seller should not be personally liable in any way for any additional taxes or for any debts or charges of either company for past or current years. Prior to the closing of the transaction on August 22, 1946, the mortgage of $5,000 was satisfied, all the cash owned by GAR, $9,055.04, was transferred to George E. Haiss as trustee, and the Haiss brothers assumed certain current liabilities in the amount of $3,453.85. Pettibone set up on its books and records as the basis of its stock of the petitioner an amount of $699,800.60, which is, with a negligible difference, the total of the cash paid by it to the Haiss brothers for stock of both the petitioner and GAR. On September 1, 1946, all the stock of GAR was transferred by Pettibone to the petitioner without consideration. In September 1946, GAR was merged into the petitioner. Its land and buildings and its machinery and equipment were transferred to the petitioner by a deed and a bill of sale, each dated September 1, 1946. The certificate of merger was filed with the State *20 of New York on October 18, 1946. Therein it is recited that the petitioner assumed all obligations of GAR. Thereafter in 1948 it paid taxes of GAR in the amount of $4,433.64. After the merger the petitioner continued to carry on essentially the same business as existed before, retaining the old corporate name and its former employees (GAR had no employees other than its officers). Expansion of the petitioner's operations was immediately undertaken, production was extended to include some of Pettibone's products, and some manufacturing operations were extended to Pettibone's plant in Chicago. By March 31, 1948, the petitioner's market had been extended to include the mid-west and the west coast. Production of loaders, which were its principal product, and which were not manufactured by Pettibone, increased from about five per month to 20 to 25 per month, the bulk of the sales being in the same area as before. The fixed assets of GAR prior to the merger were carried on its books, at depreciated cost, in the following amounts: Land
$109,826.96
Buildings
27,093.80
General Machinery
40,482.66
Cranes and Hoists
6,718.17
Boiler Room Equipment
430.34
Total
$184,551.93
*21 The fixed assets received by the petitioner from GAR pursuant to the merger were entered on the books of the petitioner as follows: Land
$ 78,020.41
Buildings, Structure & Improve-
ments
271,500.01
General Machinery
124,336.42
Cranes and Hoists
24,060.26
Trucks and Automobiles
581.47
Miscellaneous Tools and Effects
2,756.90
Total
$501,255.47 The total of $501,255.47 consists of $489,000 paid by Pettibone for the stock of GAR which was contributed to the petitioner, and $12,255.47, the amount of the remaining installment notes owing from GAR to the petitioner, which were written off in accordance with the plan of merger. This total amount was allocated among the various assets in proportion to the fair market value of each of those assets as of September 1, 1946, as set forth in an appraisal made as of September 13, 1946, by an independent appraisal company. During the taxable years the petitioner claimed depreciation deductions on the depreciable assets received from GAR on the basis of cost as determined above. The respondent, in determining the deficiencies involved herein, disallowed portions of the depreciation deductions claimed with the following *22 statement: "It is determined that the basis for depreciation of the fixed assets you acquired by merger from GAR Realty Corporation is their adjusted basis in the hands of GAR Realty Corporation at the time of the merger and not the amount claimed on your return determined by reference to the amount paid for the stock of GAR Realty Corporation by your parent, Pettibone Mulliken Corporation. "Accordingly, depreciation of $9,199.46 for the year ended December 31, 1946, $6,252.59 for the period ended January 1, 1947 to March 31, 1947, $26,508.71 for the year ended March 31, 1948, and $28,201.88 for the year ended March 31, 1949, have been disallowed as excessive as set forth in exhibits attached hereto." It was the intention of Pettibone to purchase assets owned by GAR and to cause such assets to be placed in the petitioner. The purchase of GAR stock and the merger of GAR into the petitioner were integral steps in a plan to accomplish that purpose. The cost of the assets was $489,000 (instead of $501,255.47, the petitioner having conceded that the amount of $12,255.47 should not be included in cost) and that is the amount properly to be allocated among the various assets in proportion *23 to their fair market values at September 1, 1946. Such values are those set forth in the appraisal hereinabove referred to, and by major categories are as follows: Land
$ 97,000.00
Buildings, Structures & Improve-
ments
337,556.27
General Machinery
154,585.91
Cranes and Hoists
29,907.02
Trucks and Automobiles
723.80
Miscellaneous Tools and Effects
3,428.26
Total
$623,201.26
In December 1951, the petitioner sold its land, buildings, and substantially all its machinery and equipment, ceased all manufacturing activity, and became engaged in selling only. Payments Totaling $48,000 to George E. Haiss. Prior to the sale by the Haiss brothers of the stock of the petitioner, George E. Haiss had been the most active of the brothers in the management and operation of the petitioner, having borne 70 percent of the burden of such management. Raymond was incapacitated by illness and Alfred devoted very little time to the business. At the time of the acquisition of the stock of the petitioner by Pettibone, the executives of Pettibone were heavily burdened with other matters. Although this newly acquired business was complementary to that of Pettibone, some *24 of the features of the petitioner's principal product, materials handling equipment, were novel to Pettibone and its executives, such as the designing, engineering, and marketing in the eastern area. Accordingly, Pettibone would not have been interested in acquiring the business of the petitioner unless it could have available, during a transitional period, the experience of George E. Haiss as consultant and advisor in marketing and manufacturing the products of the company. On September 1, 1946 the petitioner, by its new president, Seifert, entered into a contract with George E. Haiss, entitled "EMPLOYMENT CONTRACT," in which it was provided that George E. Haiss should be engaged and retained as industrial consultant for a period of two years. It was provided that he should supervise the planning, manufacturing, costing and marketing of loaders, conveyers and clamshells. Therein George agreed not to act as industrial consultant for any other person engaged in manufacturing the same products. The petitioner agreed therein to pay to George the sum of $2,000 at the end of each month throughout the two year period. Pettibone, by endorsement on the contract, guaranteed the payments *25 called for in the contract. During the first month or two of the contract George spent practically all his time at the petitioner's plant; during the first year about 25 or 30 percent; and during the second year about one-half of the percentage of the first year. The engineering charts and drawings of the petitioner had not been kept up todate and many engineering developments were not shown thereon. George had personal knowledge of these engineering changes and advised the new management with regard thereto in order that the charts and drawings might be corrected. This was necessitated in part in order that Pettibone's personnel in Chicago might be fully advised since some of the operations of the petitioner were to be extended to Pettibone's Chicago plant. He also gave advice to the new management regarding the reliability of the existing personnel of the petitioner. He was also familiar with the market and selling terms and advised the new management with regard thereto as well as with regard to competition and problems involved in expansion of operations. He introduced the new management to the dealers and customers and advised with regard to their financial reliability. *26 George Haiss would not have agreed to take less for his stock of the petitioner than each of his two brothers received except for the above "employment contract." For each of the years 1942, 1943 and 1944, George received $12,100 as salary from the petitioner. For the year 1945 he received a salary of $14,000. For the first eight months of 1946 he received as salary $9,333. The other two Haiss brothers received like amounts of salary from the petitioner. For each of the years 1942, 1943 and 1944, George received $1,800 as salary from GAR. For the year 1945 he received a salary of $2,500. For the first eight months of 1946 he received as salary $1,600. The other two Haiss brothers received like amounts of salary from GAR. In its returns for the calendar year 1946, the period January 1, 1947 to March 31, 1947, the fiscal year ended March 31, 1948, and the fiscal year ended March 31, 1949, the petitioner claimed deductions, as professional fees, the amounts of $8,000, $6,000, $24,000 and $10,000, respectively, paid to George. The respondent, in determining the deficiencies, disallowed these claimed deductions, holding that they were not paid for services rendered, but represented *27 part of the consideration to George Haiss for his stock of the petitioner. The contract for the sale of the stock of the petitioner owned by George E. Haiss and the "employment contract" constituted parts of one transaction, namely, the sale of the stock, and the amounts which were paid by the petitioner to George pursuant to the "employment contract" in fact constituted part of the price which Pettibone caused to be paid to him for his stock of the petitioner. Payments Totaling $52,500 to Harry W. Stelle and Corporation Services, Ltd. Harry W. Stelle, now deceased, was both an attorney and an accountant. He had been attorney and accountant for the three Haiss brothers personally for many years. In his individual capacity he had rendered legal services to the two corporations owned by the Haiss brothers, namely, the petitioner and GAR. In his capacity as president of Corporation Services, Ltd., an accounting and tax advisory company, he had rendered accounting and tax services to those corporations. Prior to August 22, 1946 the petitioner's daily accounting work had been performed by its bookkeeper. Corporation Services, Ltd., through Stelle, had been performing year-end audits. *28 Stelle in his individual capacity or as president of Corporation Services, Ltd. had also performed other services for the petitioner including those relating to safety regulations, zoning, real estate taxes, intangible property taxes, and New York franchise taxes. During the years 1941 through 1945 the petitioner paid Stelle the total amount of $2,771.81. About August 1945, which was prior to actual negotiations with Pettibone for the sale of the stock of the petitioner and GAR owned by the Haiss brothers, but after Pettibone's interest in acquiring the business was first indicated, the three Haiss brothers orally agreed with Stelle to pay him a commission of five percent of the sale price for selling the stock of those two corporations. Thereafter the negotiations on behalf of the Haiss brothers were carried on by Stelle, who first discussed the matter with Seifert in December 1945. Several meetings were held both in Chicago and New York, and the sales of stock were effected, as hereinbefore described. The five percent commission above-referred to was not paid by the Haiss brothers. However, during the course of the negotiations for the purchase of the stock, which contemplated *29 an "employment contract" for George E. Haiss, Haiss indicated to Seifert his unwillingness to agree to the proposal unless Stelle remained available to counsel him. Accordingly, on September 1, 1946, when the petitioner entered into the "employment contract" with Haiss, it also entered into an agreement with Stelle which provided that Stelle should act as attorney for a period of two years at a total retainer of $30,000, payable in equal installments each month. On the same date the petitioner also entered into an agreement with Corporation Services, Ltd. which provided that that company should prepare the petitioner's income tax returns, excess profits tax returns, sales tax reports, unemployment insurance and social security tax returns and represent it in connection with tax matters, for a period of two years at a total retainer of $22,500, to be paid in equal installments each month. While, after August 22, 1946, the petitioner had available to it the services of Cummings, who was Pettibone's lawyer, Stelle, because of his familiarity with New York law, prepared the documents necessary for merger of GAR into the petitioner and for transfer of the realty and other assets of GAR *30 to the petitioner in connection with the merger. After August 22, 1946, Stelle rendered certain services to the petitioner which included matters of zoning, collections and safety regulations. The services in regard to the safety measures and zoning problems consumed not more than a couple of days on each problem. He spent three or four days on collection matters. He, in his capacity as president of Corporation Services, Ltd., also continued to handle for the petitioner local tax matters including franchise taxes, intangible property taxes, unemployment taxes, New York income taxes, and local real estate taxes. The work in this respect was principally routine, consisting mainly of preparing the returns. Prior to August 22, 1946 the petitioner's bookkeeper had kept an elementary system of accounts, and the records were in an unsatisfactory condition. After that date the same bookkeeper continued to keep the accounts and make monthly statements. For a while these monthly statements were reviewed and checked by Stelle before they were released to Pettibone. The new management of the petitioner found it necessary to analyze the old records to determine the manufacturing cost of the *31 various products. This work was done by Stelle. In addition Pettibone undertook to set up a new accounting system for the petitioner to conform to its own, and Stelle directed this work. The principal function performed by Stelle, as representative of Corporation Services, Ltd., was to convey to the new management the accounting and tax information which he had acquired over the years. Stelle was instrumental in arranging conferences with several concerns in New York City which produced products similar to those produced by the petitioner. Such conferences were arranged between Seifert and those concerns in regard to their possible acquisition by Pettibone. After August 22, 1946 the regular annual audits of the petitioner's records were made by Pettibone's accounting firm. Such accounting firm also prepared the Federal income tax returns of the petitioner for all the taxable years after January 1, 1946. The amounts provided for in the two contracts were paid by the petitioner. In its returns for the years and period set forth below it claimed the following deductions, as ordinary and necessary expenses, of professional fees paid to Harry W. Stelle and Corporation Services, Ltd. *32 : Year Ended
Harry W.
Corporation
Or Period
Stelle
Services, Ltd.
12/31/46
$ 5,000.00
$ 3,750.00
1/1-3/31/47
3,750.00
2,812.50
3/31/48
15,000.00
11,250.00
3/31/49
6,250.00
4,687.50
In determining the deficiencies the respondent disallowed these claimed deductions in full on the ground that they did not constitute ordinary and necessary business expenses and that they were not paid for services rendered to the petitioner. In the notice of deficiency the respondent also stated: "Alternatively, if the sums were paid for services rendered they are held to be excessive as follows: Year Ended
Harry W.
Corporation
Or Period
Stelle
Services, Ltd.
12/31/46
$ 4,500.00
$ 2,375.00
1/1-3/31/47
3,375.00
2,531.25
3/31/48
13,500.00
10,125.00
3/31/49
5,625.00
4,218.75"
The total amount of $52,500 consists in part of payments for services rendered to the petitioner by Stelle and Corporation Services, Ltd., and in part of payments made in connection with the purchase by Pettibone of the stock of the petitioner and GAR, and the contemplated acquisition of other concerns. Reasonable compensation to Stelle and Corporation Services, *33 Ltd. does not exceed the amounts alternatively determined by the respondent for each of the taxable years. Additions to Reserve for Bad Debts Up to February 18, 1948, the petitioner had been using the specific charge-off method of deducting bad debts. On that date the Commissioner of Internal Revenue granted the petitioner permission to use the reserve method. The petitioner, after the acquisition of all its stock by Pettibone, proceeded to market its products throughout the east coast, in the middle west, and in the far west, and the management attempted to increase the business four or five-fold. Prior thereto the petitioner had sold primarily in the northern New England area. This expansion resulted in dealing in previously unfamiliar territory and with previously unknown customers. Both before and after the change of ownership of the petitioner practically all sales were charge sales. The following table shows the petitioner's gross sales and bad debt experience: Actual
Bad Debts
Period Ended
Gross Sales
Written Off
12/31/43
$1,116,541.00
$ 666.87
12/31/44
780,661.00
None
12/31/45
951,069.00
175.68
12/31/46
1,213,864.00
338.75
1/ 1/47 to 3/31/47
430,591.00
None
3/31/48
2,901,279.00
1,256.84
3/31/49
2,073,502.00
(192.32)
*34 The closing balance of the reserve for bad debts on March 31, 1948, was $8,743.16. The closing balance of the reserve for bad debts on March 31, 1949, was $12,435.48. In determining the deficiencies, the respondent disallowed as deductions portions of the additions to the reserve as follows: For the Year Ended
March
March
31, 1948
31, 1949
Additions disallowed as
unreasonable
$8,500.00
$3,000.00
Additions to the reserve
allowed as reasonable
1,500.00
500.00 This determination of the respondent would result in closing balances of the reserve for bad debts for the years ended March 31, 1948 and March 31, 1949, in the respective amounts of $243.16 and $935.48. Reasonable additions to the reserve for bad debts for the years ended March 31, 1948 and March 31, 1949, are $1,500 and $500, respectively, as determined by the respondent. Expenditure for Safety Devices On November 24, 1947, the petitioner expended $650 for certain safety devices in its plant, consisting of railings and shields. These were installed pursuant to the requirements of the State of New York. They did not replace old shields and guards that had already been installed. *35 This amount of $650 was entered on the books of the petitioner as "Factory Expense - Repairs" and was deducted in its income tax return for the fiscal year ended March 31, 1948, as "Repairs." The respondent disallowed the claimed deduction on the ground that it did not constitute ordinary and necessary expense, but represented a capital expenditure. Opinion The principal question presented is whether the assets of GAR which were acquired by the petitioner retained the basis which they had in the hands of GAR, for the purpose of deductions for depreciation, or whether their basis for such purpose is the amount which Pettibone paid for the stock of GAR. The petitioner contends that the various steps outlined in our Findings of Fact were merely steps of one integrated transaction necessary to accomplish the purchase of the assets, and that consequently the transaction is to be treated as a purchase of assets resulting in a new cost basis for the assets. The respondent, on the other hand, contends that Pettibone intended to and did buy stock of an integrated business consisting of the two corporations, the petitioner and GAR, and that when GAR was merged into the petitioner the *36 basis of the assets in the hands of GAR carried over to the petitioner presumably under either section 113(a)(7)(B) or section 113(a)(15) of the Internal Revenue Code of 1939. Numerous cases have held that if several transactions are in fact merely steps in carrying out a preconceived plan to purchase assets of a corporation, the individual steps taken in achieving the results, including the purchase of stock, will be ignored for tax purposes and the integrated transaction will be treated as a purchase of assets. Koppers Coal Co., 6 T.C. 1209; Commissioner v. Ashland Oil & Refining Co. (C.A. 6, 1938), 99 Fed. (2d) 588; Prairie Oil & Gas Co. v. Motter (C.A. 10, 1933), 66 Fed. (2d) 309; Kanawha Gas & Utilities Co. v. Commissioner (C.A. 5, 1954), 214 Fed. (2d)685; Kimbell-Diamond Milling Co., 14 T.C. 74 (C.A. 5, 1951), affd. per curiam 187 Fed. (2d) 718, certiorari denied 342 U.S. 827; Estate of James F. Suter, 29 T.C. - (November 18, 1957). We think the principle of the above-cited cases is applicable in the instant case. It is true that Pettibone was desirous of obtaining the stock of *37 the petitioner and operating it as a fully constituted manufacturing and sales corporation, which its president, Seifert, originally thought it was. This the petitioner does not deny. However, at the beginning of the negotiations between Seifert and the Haiss brothers, Seifert was not aware of the existence of GAR and that it owned the manufacturing facilities which were used by the petitioner. When the existence of GAR came to the attention of Seifert he insisted, on behalf of Pettibone, upon a purchase of the assets of GAR for the purpose of contributing those to the petitioner in order that the petitioner might be a fully constituted manufacturing and sales corporation. The Haiss brothers, on the other hand, would not consent to a sale of the assets, but would sell only the stock of GAR. Therefore, Pettibone, in order to accomplish its purpose, was forced to purchase the stock of GAR. The evidence clearly establishes that Pettibone did not desire to operate GAR as a separate corporation. Since Pettibone was interested in only those assets of GAR which were necessary to the carrying on of the business of the petitioner, certain other assets of GAR were segregated out prior to the *38 closing of the transaction, for the payment of current liabilities shown on the books of GAR, and the payment of any remainder to the old stockholders. We do not consider it determinative that in the stock purchase contracts the old stockholders were relieved of any other liabilities of GAR and that in the certificate of merger the petitioner assumed any other obligations; comparable facts existed in Montana-Dakota Utilities Co., 25 T.C. 408, and Kimbell-Diamond Milling Co., supra. An additional consideration from the standpoint of Pettibone was the tax consequences of purchasing stock of GAR rather than the assets. Such assets had a low basis in the hands of GAR, and Pettibone desired that the purchase price of the stock of GAR, which was considerably higher than such basis and was based upon the then value of such assets, should constitute the basis of the assets for depreciation purposes and for computation of gain or loss in the event of any subsequent sale. After obtaining advice, based upon the then recently decided Koppers case, supra, that a purchase of the stock of GAR, a contribution of such stock to the petitioner, and an immediate merger of *39 GAR into petitioner, would be treated for tax purposes as a purchase of the GAR assets, Pettibone agreed to purchase the GAR stock as a part of a plan to carry out these steps. In the Koppers case a corporation, in order to obtain assets of six other corporations, was required to purchase the stock of such corporations. Such stock was then transferred by it to an existing subsidiary in exchange for capital stock of such subsidiary. Thereafter such subsidiary in turn set up a subsidiary and transferred the stock of the six corporations to the new subsidiary in exchange for its stock. The six corporations were then liquidated and dissolved and the assets were received by the newly created corporation. We took the position that all the steps should be considered as steps in a plan to acquire only the physical assets of the six corporations and held that the cost of the stock constituted the basis of the assets. The respondent argues that the petitioner and GAR together constituted an integrated business, pointing to the fact that the same interests owned the stock of each corporation, and would have us ignore the separate identity of the two corporations. However, in our opinion the *40 separate existence of GAR cannot be ignored. Based upon the whole record we are satisfied, and have found as a fact, that the purpose of Pettibone was to purchase the assets of GAR rather than the stock of GAR as a going concern, and to cause them to be placed in the petitioner; and that the purchase of GAR stock and the merger of GAR into the petitioner were component steps in the accomplishment of that purpose. Accordingly, it is our conclusion that in substance and effect Pettibone purchased the assets of GAR for $489,000 and contributed them to the petitioner. As a consequence the basis of those assets in the hands of the petitioner is $489,000. Section 113(a)(8), Internal Revenue Code of 1939. The case of John Simmons Co., 25 T.C. 635, relied upon by the respondent, is distinguishable. There the purpose was, and the negotiations were directed toward, the acquisition of stock of a corporation conducting a going business. There was not in that case an intention or purpose of acquiring assets. This warranted the holding that the form employed, namely, the purchase of stock, was also its substance. The respondent argues, in the alternative, that the cost has been *41 improperly allocated as between the land and the depreciable properties, insisting that a greater portion should be attributed to the cost of land. The allocation was made upon the basis of an appraisal of all the assets by an independent appraisal company shortly after the acquisition of the assets. The appraisers testified at some length. We are satisfied from all the evidence that the values arrived at in the appraisal constitute the fair market values of the various assets and have so found as a fact. The allocation of the purchase price among the various depreciable properties, and the land, is properly to be made upon the basis of the appraised values. Payments Totaling $48,000 to George E. Haiss Pettibone entered into contracts with the three Haiss brothers to acquire all the outstanding stock of the petitioner. Actually Pettibone was to pay a part of the consideration agreed upon and receive some of the shares. It agreed to cause the remainder of the consideration to be paid. What actually happened was that Pettibone caused the petitioner to pay a part of the agreed consideration for some of the stock and such stock was received by the petitioner and held as treasury stock. *42 After consummation of the whole transaction, Pettibone was the sole stockholder of petitioner. Pettibone's contract with George E. Haiss called for the payment of $120,000 to George for his stock of the petitioner. This amount was paid by the petitioner and the stock was thereafter held as treasury stock. This amount of $120,000 was $50,000 less than each of the other two Haiss brothers received for his equal interest in the petitioner. The respondent has determined that in addition to the $120,000, the total of $48,000 received by George E. Haiss under the "employment contract" constituted a part of the purchase price of his stock, rather than compensation, and has disallowed deductions totaling $48,000 claimed by the petitioner as compensation paid. Certainly George's one-third interest was worth as much as the one-third interest of each of his two brothers, and it is hardly conceivable that he would have taken less than his brothers. It is to be noted that each of the three brothers received precisely the same amount for the sale of their equal interests in the other corporation, GAR. The petitioner argues that George Haiss was willing to take less for his stock than his brothers *43 in view of testimony indicating that George may have been more anxious to sell than his brothers because of the greater responsibility which he carried. However, George himself testified that he would not have taken less for his stock except for the "employment contract." The testimony of Seifert and the minutes of a meeting of the board of directors of the petitioner held on August 22, 1946, when the management was changed, also clearly indicate that the "employment contract" was a vital part of the transaction involving the purchase of the stock. We have carefully examined the provisions of the "employment contract" and the evidence presented with regard to the activities of George Haiss pursuant thereto. The function actually performed by him appears to have consisted entirely of acquainting the new management with the engineering details of the petitioner's products, the capabilities and reliability of the personnel, the existing dealers and customers and, in general, the existing methods of operation of the business. The furnishing of this information was necessary in order that the new management might properly conduct the business which had been purchased. It is not unusual, *44 in connection with purchases of businesses or assets, to require the furnishing of such know-how. It appears that George Haiss did not render continued regular service to the petitioner as the contract might indicate was contemplated. While he spent practically all of his time at the petitioner's plant during the first month or two of the contract, thereafter the time which he spent steadily decreased. Yet, pursuant to the terms of the contract, $2,000 was paid at the end of each month throughout the term of the contract. We think it is also of some significance, in conjunction with the other evidence, that the yearly amount provided in the contract was greatly in excess of the amount of salary which George Haiss had drawn from the petitioner during the years immediately preceding the change of ownership, when he bore 70 percent of the burden of management and operation. Viewing the situation realistically, and attempting to arrive at the substance of the transaction, we have concluded, and have found as a fact, that the amount of $48,000 paid by the petitioner constituted a part of the purchase price paid for George Haiss' stock of the petitioner. While the amount was paid by *45 the petitioner, it was caused to be paid by Pettibone as a part of transactions by which it ultimately became the sole stockholder of the petitioner. Although the payments totaling $48,000 were paid under a so-called "employment contract" executed by the petitioner, we think their essential character was not compensation paid for services rendered to the petitioner. The parties have cited no authorities. The only analogous case which we have found is Brush-Moore Newspapers, Inc., 33 B.T.A. 362, affd. (C.A. 6) 95 Fed. (2d) 900, certiorari denied 305 U.S. 615. In that case, as here, one stockholder entered into an agreement to sell his stock at a lesser price than other stockholders, but the difference was to be made up by payments to be made under a so-called employment contract. One difference between that case and this is that in that case it was specifically provided that the payments should be made at all events. However, as we see it, that factor was not the determinative factor in the conclusion that the payments constituted a part of the selling price. All the surrounding circumstances were taken into consideration and it was concluded *46 that the real transaction was a sale of the stock, the consideration for which included the payments under the so-called employment contract. In affirming, the Court of Appeals stated that it was hardly conceivable that the one stockholder would have taken less for his stock than the other stockholders. In the instant case George Haiss testified that he would not have taken less for his stock than his brothers received, except for the employment contract. As stated, the respondent determined that the amounts here in question did not constitute compensation paid by the petitioner, but, rather, constituted part of the purchase price paid for the stock. We are not persuaded to the contrary by the evidence adduced. Accordingly, the respondent's disallowance of the deductions claimed by the petitioner on account of the payments under the contract is approved. Payments Totaling $52,500 to Harry W. Stelle and Corporation Services, Ltd. The respondent has disallowed as deductions the full amount of $52,500 paid to Harry W. Stelle and Corporation Services, Ltd., on the ground that the payments totaling that amount did not constitute ordinary and necessary business expenses, and that *47 they were not paid for services rendered to the petitioner. On brief it is his contention that this amount constituted commissions caused by Pettibone to be paid to Stelle in connection with the sale of the stock of the petitioner and GAR to Pettibone, and hence should be considered a part of the cost of such stock. Stelle represented the Haiss brothers in their negotiations with Pettibone for the sale of the stock of the petitioner and GAR and he did considerable work in connection therewith. We are also satisfied that the Haiss brothers did orally agree to pay a commission of five percent of the selling price of the stock, but they themselves did not pay such a fee. Nor did Pettibone pay such a fee as such. George Haiss testified generally to the effect that it was his understanding that the fee was to be paid by Pettibone. On the other hand, Seifert, who was president of Pettibone, testified that he was not aware of any contract or arrangement which had been entered into with Stelle for the payment of an amount of money as a commission. He did testify, however, that during the course of the negotiations for the sale of stock and in connection with the proposed "employment contract" *48 with George E. Haiss, the latter said "that he wouldn't want to go on this thing unless Harry Stelle was with him at his side, and counsel him because he had certain obligations and wanted to be protected." It appears, therefore, that the contracts between petitioner and Stelle and his company were the result of the insistence of Haiss. Certainly Stelle did act as the broker in the transaction and would be entitled to some remuneration, especially in view of the agreement made by the Haiss brothers. Unless the amount in question or some portion thereof represented such a commission, he received no commission. In the first place, it appears that the total amount of $52,500 is an unreasonably large amount to have been paid by the petitioner, in the light of the evidence of the services which Stelle actually performed. The contract with Stelle called for his services as an attorney. Actually the petitioner had available the legal services of counsel for Pettibone. As pointed out in our Findings of Fact any legal services performed by Stelle were minor, except possibly the legal work in connection with the merger of GAR into the petitioner. The contract with Corporation Services, Ltd. *49 provided that that company should prepare the petitioner's income tax returns, excess profits tax returns, sales tax reports, unemployment insurance and social security tax returns, and represent it in connection with tax matters. It is noted particularly that that contract did not call for the performance of any accounting service. The evidence shows that the Federal income tax returns of the petitioner for all years after January 1, 1946, were prepared by another accounting firm employed by Pettibone. The service of Stelle or his company with regard to taxes was limited to local taxes, which was the same service which he and his company had rendered for the petitioner prior to its change of ownership. We note that Stelle received from the petitioner only $2,771.81 for the years 1941 through 1945, during which period Stelle and his company were rendering similar service, plus the service of year-end accounting. It is true that for a time after the change of management Stelle reviewed statements made by the bookkeeper of the petitioner, made certain analyses of the old records to determine manufacturing costs and assisted in setting up a new accounting system for the petitioner to *50 conform to Pettibone's system. These services were not called for in either of the contracts and continued only for a limited time. Seifert testified to the effect that the principal function performed by Corporation Services, Ltd. was to convey to the new management the accounting and tax information which had been acquired over the years. Under the circumstances these particular services might well be deemed to have constituted in large part services in connection with the acquisition of the petitioner by Pettibone. Other services of Stelle, consisting of arranging conferences between Seifert and other concerns, with a view to acquisition thereof by Pettibone, were clearly for the benefit of Pettibone, rather than the petitioner. In the exercise of our best judgment, we have concluded that the payments totaling $52,500 were partly in consideration for services rendered by Stelle and his company to the petitioner, but to a greater extent for services in connection with the purchase by Pettibone of the stock of the petitioner and GAR and the contemplated acquisition of other concerns. In the notice of deficiency the respondent took the position that if any portion of this total *51 amount of $52,500 constituted compensation for services actually rendered to the petitioner, it is only the portion in excess of $46,250, namely, $6,250, allocated over the taxable years as follows: Year Ended
Harry W.
Corporation
Or Period
Stelle
Services, Ltd.
12/31/46
$ 500.00
$ 1,375.00
1/1-3/31/47
375.00
281.25
3/31/48
1,500.00
1,125.00
3/31/49
625.00
468.75
Total
$ 3,000.00
$ 3,250.00
We have concluded, and found as a fact, that the amounts of reasonable compensation for Stelle and his company for services to the petitioner are not in excess of the amounts alternatively determined by the respondent. Upon the recomputation under Rule 50 deductions for compensation paid will be limited to the amounts set forth immediately above. Additions to Reserve for Bad Debts The petitioner argues that because it entered into new territories, acquired new customers, and increased its gross sales, practically all of which were on credit, it was reasonable to charge to its reserve for bad debts the amounts of $10,000 and $3,500, respectively, in the years ended March 31, 1948 and March 31, 1949. In the light of the actual bad debt experience of *52 the petitioner both in prior years and in the years in question, we see no justification for the additions of such large amounts to the reserve. The evidence submitted by the petitioner does not overcome the presumption in favor of the respondent's determination of $1,500 and $500, respectively, as reasonable additions to the reserve for those years. Indeed the evidence supports the reasonableness of his determination and we have so found as a fact. We accordingly approve the respondent's determination in this respect. See, C. P. Ford & Co., Inc., 28 B.T.A. 156. Expenditure for Safety Devices The expenditure of $650 for safety devices was clearly not an expenditure for repairs, as claimed by the petitioner in its return. Furthermore, insofar as the evidence shows, the useful life of these devices would extend beyond the taxable year and possibly for a number of years. The petitioner has not overcome the presumption in favor of the respondent's determination that the expenditure was of a capital nature and did not represent an ordinary and necessary business expense. The respondent's disallowance of the claimed deduction is approved. See Hotel Sulgrave, Inc., 21 T.C. 619. *53 Decision will be entered under Rule 50.